(38 App. Div. 295.)

## CENTRAL TRUST CO. v. FOLSOM et al.

(Supreme Court, Appellate Division, First Department. March 24, 1899.)

MORTGAGES—COLLECTION—AUTHORITY OF AGENT.
    A trustee examined mortgaged property, and then paid trust funds to his attorney, in whose office he had a desk, and the attorney procured an assignment of the mortgage to the trustee from another client, who held under a fourth assignee. The mortgage was then placed in the trustee's box, to which the attorney had a key, while the box was kept in his safe. The mortgagor's vendee knew that the mortgage had been in the attorney's possession from the execution of the fourth assignment, and he first learned of the last assignment from the attorney nearly a year after its execution, when he paid interest. The attorney, under authority from the fourth and fifth assignees, collected interest for them. Held, that the attorney had no apparent authority to collect the principal from said vendee, on surrendering the mortgage and assignments, within the rule conferring such authority where an attorney makes an investment for another, and is intrusted with the possession of the securities in which the investment is made.
    Barrett and O'Brien, JJ., dissenting.

Appeal from special term.

Action by the Central Trust Company, as substituted trustee for the separate estate of Isabel Von Linden, against George W. Folsom and another, to compel the surrender of a mortgage. Judgment for defendants, and plaintiff appeals. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Alfred J. Taylor, for appellant.

Geo. V. N. Baldwin, for respondent Folsom.

RUMSEY, J. On the 18th of October, 1883, the defendant Daniel Morison was substituted in the place of another person as trustee under an antenuptial agreement for the benefit of Mrs. Isabel Von Linden, and he occupied that position until some time in the year 1889. In the performance of his duties as trustee, he was accustomed to consult as attorney one Francis H. Weeks, who was familiar with the trust. The securities of the trust were kept by Morison in a box, upon which his name was painted, and the box was kept in Weeks' safe, in his office, where Morison also had a desk, and he had no other place of business. In the month of June, 1885, Morison received a sum of money belonging to the trust fund, which he deposited in a bank, where he kept such funds to his credit as trustee. Being desirous to invest it, he consulted Weeks about a proper investment. Weeks, who was also the attorney for other people, told him that he had in his possession a mortgage, made on the 15th of May, 1848, by the trustees of Margaret C. Folsom, and by George Folsom and Margaret C., his wife, to Laight and Emmet, as trustees, which mortgage, as it seems, was long past due. By mesne assignments it had been transferred to and was then owned by Mrs. Ada L. Saalfield, whose attorney Weeks was. Mrs. Saalfield desired to dispose of it, and Weeks recommended it to Morison as a desirable investment. Morison examined the property upon which the mortgage was a lien, and, relying on his own judgment after the examination, as well as on Weeks' recommendation, told Weeks that he consented to the investment; and, at the same time, he gave to Weeks his check, as trustee, for $7,000 upon the bank in which his account was kept, and desired him to purchase the mortgage and procure an assignment of it, which Weeks did. The bond and mortgage, with all the assignments, including that to Morison as trustee, were put in Morison's box in the safe. To that box Weeks had a key, so that he could get to the securities, and indorse upon them interest which was paid from time to time, which he had authority to receive. To that extent Weeks had the control and possession of the securities. The Saalfield mortgage had been in his possession ever since it had been assigned to Mrs. Saalfield, and that fact was known to George W. Folsom, who was not the mortgagor, but was the person to whom the mortgaged premises belonged, and who was accustomed to make payments of interest upon the mortgage. In the early part of May, 1886, Folsom, not having received any notice up to that time of the assignment of the mortgage to Morison as trustee, went to Weeks for the purpose of paying the interest on it,

which was done, and he obtained from Weeks a receipt for the interest, signed by Daniel Morison as trustee; and that, as he says, was the first information he had that the mortgage was not owned by Mrs. Saalfield, but was owned by Morison. At the same time he advised Weeks that he wanted to pay the principal, and it was arranged that he should do so on the 1st of June. On the 2d day of June, Folsom came to Weeks again, paid him the interest on the security for a month, and at the same time gave to the order of "Francis H. Weeks, attorney," a check for $7,000 to pay the principal of the bond and mortgage. Weeks received the check, produced the bond and mortgage, and the assignments, of which there were five, and delivered them to Folsom. Only three of these assignments had been recorded. Folsom took the bond and mortgage and the assignments which had been recorded, and left the unrecorded ones with Weeks, requesting him at the same time to obtain a satisfaction of the bond and mortgage from Morison, and put that, with the unrecorded assignments, on record, which Weeks promised to do, but never did. Weeks cashed the check, and used the money, and made no report of this transaction to Morison, but continued to pay him the interest on the mortgage, as though it was an outstanding investment of the trust, until 1889, when Morison resigned as trustee, and Weeks was substituted in his place. After that substitution, Weeks still continued to carry the mortgage on the books of the estate as an outstanding investment, paying the interest upon it from year to year, until, in the month of July, 1893, Weeks having been shown to be a defaulter to a large amount, the plaintiff was substituted as the trustee of Mrs. Von Linden. It was then ascertained that Folsom had possession of this mortgage, having claimed that he had paid it. The plaintiff demanded that Folsom deliver the mortgage to it, which he refused to do; and thereupon this action was brought, asking as relief that Folsom deliver the bond and mortgage to the plaintiff, and that Morison, as trustee, execute an assignment of it to the plaintiff.

The only question presented is whether the transaction between Weeks and Folsom on the 2d of June, 1886, when Folsom delivered the $7,000 check to Francis H. Weeks, attorney, and received the bond and mortgage, operated as a payment, so that, as between Folsom and Morison, as trustee, the mortgage was satisfied. The learned justice before whom this case was tried, in a careful decision, in which all the facts are found substantially as above stated, has determined that Weeks had the custody and possession of the bond and mortgage as attorney for Morison, and had authority to collect the interest and principal thereon, and that the mortgagors were justified in relying upon his apparent authority, and are to be protected in the payment which was made by George W. Folsom. In his decision the learned judge found, as a fact, that George W. Folsom, who paid the principal upon the mortgage to Weeks, was one of the mortgagors. In this finding he is plainly mistaken. The name of the mortgagor was George Folsom, and not George W. Folsom, and it is quite apparent that the two were different people, and that George W. Folsom was not one

of the mortgagors, although it does not precisely appear what was his relation either to the mortgage or to the mortgagors. In the former appeal in this action (which is reported in 26 App. Div. 40, 49 N. Y. Supp. 670), it was held that, upon the facts then proved, it did not appear that Weeks had any authority to receive the payment of the principal upon this security, and that, therefore, it was erroneous to hold that the bond and mortgage were satisfied by the payment by Folsom to him. It did not appear in that case how Morison came to have the assignment, nor did it appear that Weeks had any authority whatever to interfere with the security or to take possession of it for any purpose, and the holding in that case was based largely upon the lack of evidence in that regard. The defendant claims that this defect is now remedied, and that his case is brought within the rule that where an attorney has made an investment for a third person, and is intrusted with the possession of the securities in which the investment is made, there arises an apparent authority on his part to receive payments of principal and interest upon the security as they are due, and that the maker of the security has a right to rely upon that apparent authority, and is to be protected in all payments which he makes in reliance upon it, while the defendant is in fact in possession of the security. This rule is well settled, and the only question is whether the facts which have been proved bring this case within the well-settled rule. The rule took its rise in England, and has been imported into this country. It is based upon the well-known custom among many people in that country, of intrusting to agents, who may or may not be attorneys, the entire management of investments, delivering to the agent the money to be invested, permitting him to seek out and make the investment upon his own judgment, without consultation with his principal, and expecting him, having made this investment, to retain possession of the securities and receive such payments of interest and principal as might fall due upon them. Under those circumstances, it was undoubtedly proper to say that the agent thus intrusted with the making and management of the investment and the custody of the securities for the purposes of collection was invested with the apparent authority to receive whatever money might be due upon them from time to time. But the foundation of the rule was the fact of the agency to make and control the security, existing between the owner and the person who made the investment, to the knowledge of the debtor; and the apparent authority to receive the payments was held to exist because the owner, having made the investor his agent to make the instrument at his discretion, and having intrusted him with the apparent right to collect the money, was held to be estopped from questioning the extent of the authority which had apparently been given to one who was confessedly his agent in the original transaction. That this is the basis of the rule is apparent from what is said in the case of Doubleday v. Kress, 50 N. Y. 410, in which it was held that mere possession of the security (which was a promissory note payable to the order of the owner), unindorsed,

was not sufficient to authorize payment to him. Judge Peckham says that to give validity to the payment there must be some other fact than the mere possession by the agent of the security. "That the agent took the security, negotiated and made the loan for which the security was taken, and was therefore intrusted by the owner with the possession, is sufficient to render the payment valid." The reason of the rule that one who has made the loan as agent, and taken the security, is authorized to receive the payment when he retains possession of the security, as he says, "is founded upon human experience that the payor knows that the agent had been intrusted by the payee about the same business, and he is thus given credit with the payor." It was held in that case that the mere possession of the security, although with authority to receive the interest, did not carry with it apparent authority to receive payment of the principal, although the principal was then due; and a judgment holding that a payment of the principal to such a person was good was reversed. In the former report of this case (26 App. Div. 40, 49 N. Y. Supp. 670), it was held that the authority to receive payment of the principal is not to be inferred from the attorney having received the interest, nor from the mere possession of the security, but it must result from the whole control of the investment from beginning to end by the attorney or solicitor. The lender must part with his money to the solicitor for investment, and give him absolute control of the whole matter. The same principle was adopted by the court of appeals in Crane v. Gruenewald, 120 N. Y. 274, 24 N. E. 456. To the rule, as thus stated, there can be no objection. The payor, to whom the loan has been made, knows that the person with whom he dealt was the agent of the investor to take the security. The fact of agency is, therefore, established, to the knowledge of the debtor, and it is but just that the person who has thus created his agent in the matter of the security should not be permitted to deny the existence of the agency, or the authority of the agent, as long as he has possession of the security, and thus has apparent control over it. All the cases hold that the agency arises from the fact of the investment having been made by the agent with the payor, and continues only so long as he has the actual possession of the security. It is so stated in the text-books. Judge Story says that if the agent made the loan, and is intrusted with the security, an implication of authority to receive the money may be deduced from that fact, in connection with the other. Story, Ag. 398, and cases cited. In every case which I have been able to find, the agency has been held to depend upon the fact of the original investment having been made by the agent, and stress has been laid upon that fact in each of them.

The case of Williams v. Walker, 2 Sandf. Ch. 325, is relied upon as constituting an exception to the rule. In that case Bancker, the alleged agent, had not made the original investment, but he had taken an assignment of it for Mrs. Williams, the plaintiff, and the securities were in his possession a large portion of the time. He was intrusted with the care of the plaintiff's money, and made investments for her,

and the security was delivered to him by the owner to receive payments on it while Mrs. Williams was in Europe, from 1835 to 1837, for about 18 months, and at that time Bancker held a general power of attorney, with one Pearsall, to attend to Mrs. Williams' business. As such attorney, and under that power, Bancker had possession of the bond and mortgage, and received four payments of principal upon it, amounting to $356. After Mrs. Williams' return, the bond and mortgage were delivered by Bancker to her, but he still continued to receive payments upon the principal until the whole mortgage had been satisfied, although the money thus paid was not delivered to the plaintiff, and she knew nothing about it. In an action brought by Mrs. Williams to foreclose the mortgage, the defendant claimed that she had fully paid it, and the question was whether the money paid to Bancker should be credited to her as a payment upon the mortgage. The assistant vice chancellor examined the case in a learned opinion, and, laying down the rule as stated above, held that Bancker's agency in this investment was the same as that of a scrivener in England; and that he, having purchased the mortgage, and having had possession of the security, had apparent authority to receive payments of the principal and interest upon it while it was in his possession; and that, consequently, Mrs. Williams was chargeable with the four payments made while the mortgage was in his possession, but that she was not chargeable with the payments made after the security had passed out of his possession by delivery to the true owner. There is no question that the case was well decided, because there is no dispute as to the general agency of Bancker to receive the money upon this investment, which was known to the mortgagor. It is quite true that his general agency only existed in connection with that of Pearsall, and, undoubtedly, he would have no authority alone, under that general power of attorney with Pearsall, to make any investments; but it is equally true that, having the security in his possession, he was authorized to receive the money upon it, although Pearsall was attorney with him, because, although the principal, when he makes two persons his attorneys jointly, is entitled to the exercise of the discretion of both of them, yet when business intrusted to them is simply a matter of detail, such as receiving payment already due upon a security, that one of the attorneys who has the custody of the security may undoubtedly receive it, and the payment thus made to him would be good. For this reason, a payment to Bancker while he was one of two attorneys, and intrusted with the security, was undoubtedly binding upon Mrs. Williams, and therefore it was proper to charge her with those payments. But the case has never been cited, so far as I can discover, to extend the scrivener's rule, so called, to a case in which the attorney did not make the original investment; but it has always been cited to the point that where the agent had possession of the security, with apparent authority to receive the payments, payment of the principal was good. In Hatfield v. Reynolds, 34 Barb. 612, Smith v. Kidd, 68 N. Y. 130, and Crane v. Gruenewald, 120 N. Y. 274, 24 N. E. 456, the fact was that the attorney had been intrusted with the money, and authorized to make the original loan, and left in possession of the security; and, because of that fact, it was held

that, so long as he was in possession of the security, he had apparent authority to receive the money, principal and interest; and the case of Williams v. Walker, supra, was cited as to the effect of permitting the attorney to have custody of the security. But, in this case, Weeks did not make the original loan, and there was no reason on the part of the mortgagor to believe that he had any authority to receive any payments whatever upon the security; nor was there any reason to believe that he was at all agent of the trustee for any purpose, except to receive payment of the interest.

But authority to receive payment of the interest does not authorize the agent to receive payment of the principal. Brewster v. Carnes, 103 N. Y. 556, 9 N. E. 323. Therefore the rule of the scrivener's act cannot be extended to protect the payment of principal in this case, unless it shall be held that the part taken by Weeks in the transfer of the mortgage from Mrs. Saalfield to Morison, as trustee, was the making of the investment, within the scrivener's rule. It is apparent that Weeks did not make this investment in any other sense than any attorney makes an investment for his client. It is quite true that he had the bond and mortgage in his possession, and that he called the attention of Morison to it, but he never had vested in him any authority to take that mortgage, or to pay the money of the trustee for it, and he never had any communication with the mortgagor or the person by whom payment was to be made, so that he might infer, from Weeks' connection with the security, that he had authority to act for Morison in any way. No money was ever given to Weeks to invest at his discretion, and all the power he had with reference to this mortgage was to receive the check made to his order, transfer it to the credit of Mrs. Saalfield, and procure an assignment to Morison as trustee. In all that, no discretion whatever was vested in him. He cannot be said, therefore, to have made this investment, in any sense whatever. Folsom, who made this payment, had no knowledge whatever of Weeks' agency, and no reason to believe that Weeks was an agent of Morison for any other purpose than to receive the interest. He did not know what part, if any, Weeks had taken in the purchase of this mortgage. So far as appeared to him, Morrison had done nothing to warrant the inference that Weeks was his attorney for any other purpose than to receive the interest on that mortgage. He made no inquiry of anybody, not even of Weeks, as to the extent of his authority, although he knew that Morison, as trustee, was the owner of this bond and mortgage. It seems to us, therefore, that this is not a case where the scrivener's rule should be applied to the full extent, and for that reason the learned justice of the special term was in error in the conclusion which he reached, and the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur, except BARRETT and O'BRIEN, JJ., dissenting.

BARRETT, J. (dissenting). Was Weeks clothed by Morison, trustee, with apparent authority to receive payment of the principal of the mortgage? That is the precise question. Mr. Folsom, when he made the payment, knew that Weeks had possession of the securi-

ties.  They were, in fact, delivered to him by Weeks upon such payment.  He also knew Weeks' previous relation to the securities. That relation extended over a long period.  For many years Folsom had been in the habit of paying interest upon the bond and mortgage, to Weeks, as attorney for a prior assignee thereof, a Mrs. Saalfield, formerly Mrs. Sutton.  During all these years Weeks had possession of the securities.  He in fact negotiated the transfer to Morison, as trustee of Madame Isabel Von Linden.  Morison did not even know Mrs. Saalfield.  All he knew was that Weeks told him it was a client of his who wanted the money.  "I have an idea," he testified, "that Sutton was the name."  He gave his check to Weeks for the price of the mortgage, and Weeks did the rest.  Weeks arranged the purchase from Mrs. Saalfield, drew the assignment, witnessed it, and, as a notary public, took her acknowledgment. ' All that Morison did, from beginning to end, was to look at the property to see if it was sufficient security for the money, and to give Weeks a check for the purchase price.  Upon this transfer, the securities remained in Weeks' possession, just as they had during Mrs. Saalfield's ownership.  They were not even physically delivered to Morison; and so little had he to do with them that he could not, upon the previous trial, swear even to a remembrance that in his trust estate there was a mortgage known as the G. W. Folsom mortgage.  Weeks simply took these securities out of one pigeonhole in his safe (Mrs. Saalfield's), and put them in another (Morison's); or put them in the latter's box in the same safe, to which box Weeks had the key.  They were so placed there with nearly all of Morison's other securities, both trust and personal, which were also in Weeks' possession.  The statement in the majority opinion that Morison had a desk in Weeks' office is directly opposed to the evidence.  Morison had no desk there.  Weeks so testified, and Morison said nothing to the contrary.  Morison left almost everything with respect to the trust estate to Weeks.  In March, 1885, he wrote to Madame Von Linden as follows:

"If anything should happen to me by death or accident, you will find all your securities that have come into my hands in a tin box in safe at De Forest &. Weeks' office, and key with F. H. Weeks.  The tin box is marked with my name on it.  I thought I would mention this in case anything should happen to me."

And, again, in November of the same year:

"Mr. Weeks promised me he would write you and your husband in relation to my duties as trustee in the matters of paying back moneys advanced by your mother.  I hope he has done so.  I have invested all of your money in my hands, except a balance of $2,000, which seems to be difficult to get a mortgage for so small amount, but Mr. Weeks thinks he will be able to get one."

Weeks testified, without contradiction, that Morison's papers as trustee were all practically under his control at all times during the trusteeship.  Weeks even made out the accounts which Morison rendered to Madame Von Linden.  Sometimes he sent them direct to her; at other times he gave them to Morison to be sent. He collected interest upon all the mortgages, and deposited such interest in his own bank.  As a general thing, he waited until a

considerable amount of interest had been thus collected, before accounting therefor. He then drew his check, not for each specific sum, but for the aggregate of such collections. At times, he gave this check to Morison; at other times, he himself deposited it in Morison's bank, he having possession also of Morison's bank book. He made no written statements to Morison of his doings, and the latter was satisfied with what he at times "mentioned" to him, "merely in conversation." Morison's own testimony is quite as suggestive as is Weeks' of his practical abandonment to Weeks of his trust functions. The following questions were put to Morison, and the following answers given:

"Q. Well, did you pay any attention to these securities that were left there with Weeks, as to whether or not interest was or was not paid on them? A. Well, I had to be guided a great deal by him, sir, in that respect. Q. You did not look them over periodically yourself, to see whether the payments had been kept up or not? A. No, sir, not at stated periods; no, sir, I did not; in fact, I left that entirely with him; he was a person that probably I could not get along with very well if I did that. Q. Well, do you remember noticing whether there were any indorsements of interest paid on this bond and mortgage during the time they were in Weeks' office there, either in the box or any place else? A. No, sir, I couldn't say that I looked particularly for that; I couldn't say that, now. I couldn't say positively whether I looked on them to see whether there were any indorsements of these payments or not. * * * Q. Do you remember seeing that bond and mortgage? A. Well, it is a long time now, thirteen years,—twelve or thirteen years. I knew of it as a 'Folsom mortgage'; I might have seen it with the others. I never looked particularly at it, but I looked more to the memorandum. * * * Q. Did he, at any interval, or regular intervals, make any statement to you as to the amount of interest he had collected on account of the securities that were left in his office by you as trustee, so that you were posted at all as to whether or not the interest was being paid or was not? A. I think he did at times mention the fact that so and so paid. Mentioned it merely in conversation. He did not make any written statements to me."

It is difficult to perceive why, upon all this evidence, a finding of actual authority to collect principal, as well as interest, would not have been justified. If the interest had not been paid, why could not Weeks, under these relations between himself and Morison, have foreclosed the mortgage, and collected the principal? It is plain that the practical management of the securities, and the obtaining therefrom of what was coming to the estate, was left entirely to him. But, apart from that, there can, in my judgment, be no doubt of the apparent authority. Mr. Folsom knew that these securities were, and had been for years, in Weeks' hands. He knew, therefore, that it was no temporary or transient custody, and that it was not for the purpose of ordinary attorney's work. It was rather apparently, as it was in fact, for the continuous duty of a family solicitor. He knew, when he received Morison's receipt for interest, that Mrs. Saalfield had transferred the securities to Morison, as trustee. He knew, too, that they remained in Weeks' possession after that transfer, precisely as they had before. What, then, did he not know? What was not "apparent"? This, and this only: He was not directly informed that Weeks had, as between Mrs. Saalfield and Morison, negotiated the sale of the securities. That is absolutely the only point of distinction between this case and the cases in this state in which has been adopted the scrive-

ner's rule. The reason of that rule has long since ceased to be a controlling factor in its application here. It has been adapted and applied to our local conditions, and as thus adapted and applied has become the settled law of this state. It is now independent of its scrivener's origin. The settled rule here is that the debtor, be he the original mortgagor, or, as in the present case, a subsequent owner of the equity of redemption, is authorized to infer that the agent who negotiated either the original loan or the subsequent transfer of the securities is empowered to receive both principal and interest, from his having possession, in the one case of the bond and mortgage, and in the other of the bond and mortgage plus the assignment thereof. Williams v. Walker, 2 Sandf. Ch. 325; Hatfield v. Reynolds, 34 Barb. 612; Megary v. Funtis, 5 Sandf. 376; Merritt v. Cole, 9 Hun, 98; Wardrop v. Dunlop, 1 Hun, 330; Smith v. Kidd, 68 N. Y. 130; Crane v. Gruenewald, 120 N. Y. 274, 24 N. E. 456. In not one of these cases was it held, or even intimated, that knowledge on the part of the debtor of the original negotiation of the securities by the attorney, or knowledge of his subsequent negotiation of the transfer thereof, was essential to warrant the inference of authority to receive the principal. It was held that such fact must exist, but not that the debtor must be aware of it. The apparent authority to receive the principal lies in the possession of the securities. That possession is, as was said by Rapallo, J., in Smith v. Kidd, supra, "the indispensable evidence of his authority to collect the principal"; citing 1 Moll. 487. And the fact of the negotiation of the securities by the agent affords no proof of such authority. In Whitlock v. Waltham, 1 Salk. 157,— a case frequently referred to in our courts with approval,—the rule was laid down that:

"If an agent be intrusted with the custody of a bond, he may receive the interest; and, though he fails, yet the mortgagee shall bear the loss. And so it is, also, in such cases, if he receives the principal, and delivers up the bond. After being intrusted with the security itself, it shall be presumed he is intrusted with power over it, and with power to receive the principal and interest."

The original or subsequent negotiation of the securities by the attorney plays no part in the apparent authority. That is simply the postulate upon which the apparent authority evidenced by the possession rests. Even in Doubleday v. Kress, 50 N. Y. 410, the only reason why the possession of the note was held to be insufficient to authorize payment to the attorney was that it was unindorsed by the payee, and consequently the lack of authority was apparent upon its face. Williams v. Walker is precisely in point on this head. There, the attorney took no part in the original transaction; he did not negotiate the loan from Isaac Halsey to Mrs. Walker; he came into the matter subsequently, when Halsey assigned the bond and mortgage to the complainant, Miss Williams; he negotiated that transfer, just as Weeks negotiated the transfer here; and, in like manner, he was intrusted with the securities; and he received the principal professedly for Mrs. Walker. Like Folsom here, Mrs. Walker was not informed of the fact that

the attorney had made the investment for Miss Williams, or had thereupon attended to the execution of the assignment. The only notice she had was of the assignment itself, just the notice which Folsom had when he took Morison's receipt for interest. But she found the securities in the attorney's possession, and it was held that, from that fact, and that alone, she was authorized to infer· that the attorney was empowered to receive the principal. This case has been repeatedly cited, with commendation, in the courts of· this state. I have been· unable to find, in any of the numerous cases wherein it has been cited, a single intimation of doubt as to· its authority. The suggestion in the majority opinion that that case was correctly decided, because the attorney's possession of. the securities was under a joint power which he possessed with one Pearsall, is now made for the first time. The effect of this sug-· gestion is substantially to overturn the real doctrine upon which the case was decided. It is that doctrine, and not the general correctness of the decision, which has. since received such universal approval. The joint power of Pearsall and the attorney played no part in the decision. On the contrary, it was repudiated as a gov-· erning factor. This is the language of the learned Assistant Vice Chancellor Sandford:

"During her (Miss Williams') absence in Europe, in 1836–37 he (Bancker, the attorney) and Mr. Pearsall were her general agents, by a written power of attorney, and no doubt were authorized to receive the principal, as well as interest, upon her securities. But this was a joint power, which Bancker, could not exercise alone. Aside from the joint authority to Pearsall and himself, it does not appear that he was at any time the general agent of the complainant. Nor is there any course of dealing shown between her and Bancker, in reference to her securities or investments, from which the court can infer, or Mrs. Walker was entitled to assume, that he was authorized to receive the principal sums which he or others had invested for her. The authority of Bancker (if there was any which can relieve Mrs. Walker from this cruel loss) must be derived from his capacity, as solicitor, for investing, and, as agent, for collecting, the interest, and from the transactions in respect to this particular security."

He then proceeds to discuss the inference deducible from the· possession of the securities, and, upon an elaborate review of the cases, places his judgment solely upon the legal effect of their pos-· session. In Hatfield v. Reynolds, 34 Barb. 612, the same rule was stated, with great clearness. Referring to Williams v. Walker, Judge Emott said:

"The opinion of the assistant vice chancellor contains a clear and full summary of the cases, and they establish the proposition that, when an agent employed to take a bond or other security for money is not intrusted afterwards with its possession, he is not authorized to receive payments upon it; and, contrariwise, if such agent is intrusted with the continued possession of· the· bond or evidence of debt, authority for him to receive payment may be implied. So the rule is stated in the text-books. Paley, Ag. 274; Story, Ag. §§ 98, 104. * * * As the fact is distinctly shown in this case that Purdy, after having been employed to make the loan, was intrusted with the posses-· sion of this bond and mortgage, and was permitted to receive payments upon it, and to indorse them for the plaintiff, until, and at the time when, the payments were made which extinguished the principal, we are of opinion that he was, in fact and in law, authorized to receive the latter, as well as the former,· payments, and that the loss consequent upon his embarrassments and in-· .

solvency must fall upon the plaintiff who first employed and continued to trust him."

This rule was fully reaffirmed in Crane v. Gruenewald, supra. In all these cases the possession of the securities is treated as indicative of the apparent authority. The debtor takes the risk of that apparent authority being unreal. The possession may be unlawful or accidental. The mortgagee or the assignee may never have intrusted such possession to the attorney. In that case the payment is unauthorized. But, if he has intrusted such possession to the attorney, the debtor does not lose his money merely because, when he made the payment, he was not informed of that circumstance. The apparent authority must be supplemented with the fact that the securities were intrusted to the attorney by the mortgagee or assignee, but not necessarily with the knowledge of that fact. So with the still anterior fact of the attorney's negotiation of the security. The apparent authority must be supplemented with that circumstance, as well, but not necessarily with knowledge thereof. If the debtor pays upon the apparent authority inferable from the possession, his payment is good, if the anterior circumstances, upon which the intrusted possession rests, are actual facts. He takes that risk, and that only. The payment here was made upon the apparent authority of the attorney, resting solidly upon all the facts which, under well-settled rules, gave it life and substance. Such payment was therefore good. It is not, in my judgment, the province of a court of intermediate appeal to modify the rules which have been clearly laid down by the court of last resort. If these rules are not adapted to the present conditions of our modern business life, the propriety and wisdom of limiting or expanding them should be left—where it exclusively belongs—to the court which has authority to reconsider its own judgments. I feel constrained, therefore, to dissent from the opinion of the majority of my brethren, and to vote for the affirmance of this judgment.

O'BRIEN, J., concurs.